## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CROCS, INC.,<br><br>                                    Plaintiff,<br><br>            v.<br><br>DR. LEONARD'S HEALTHCARE CORP.<br>D/B/A CAROL WRIGHT, STAR BAY GROUP<br>INC., 718CLOSEOUTS, ROYAL DELUXE<br>ACCESSORIES, LLC, and FUJIAN HUAYUAN<br>WELL IMPORT AND EXPORT TRADE CO.,<br>LTD.,<br><br>                                    Defendants. | Case No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Crocs, Inc., through its undersigned counsel, brings this Complaint against

Defendants Dr. Leonard's Healthcare Corp. d/b/a Carol Wright, Star Bay Group Inc.,

718Closeouts, Royal Deluxe Accessories, LLC, and Fujian Huayuan Well Import and Export

Trade Co., Ltd. ("Defendants"):

## THE PARTIES

1.      Crocs, Inc. ("Crocs") is a Delaware corporation whose principal place of business

is 13601 Via Varra, Broomfield, Colorado.

2.      On information and belief, Dr. Leonard's Healthcare Corp. d/b/a Carol Wright

("Carol Wright") is a New Jersey corporation with its principal place of business at 100 Nixon

Lane, Edison, New Jersey. On information and belief, Carol Wright owns and operates the website

carolwright.com.

3.     On information and belief, Star Bay Group Incorporated ("Star Bay") is a New Jersey corporation with its principal place of business located at 390-400 Railroad Avenue, Hackensack, New Jersey.

4.     On information and belief, 718Closeouts is an unincorporated business with its principal place of business at 1181 Liberty Avenue, Brooklyn, New York.

5.     On information and belief, Royal Deluxe Accessories, LLC ("Royal Deluxe") is a New Jersey limited liability company with its principal place of business at 165 Spring Street, New Providence, New Jersey.

6.     On information and belief, Fujian Huayuan Well Import and Export Trade Co., Ltd. ("Fujian") is a Chinese corporation with a principal place of business at Rm. 02, Connector of Hongyuan Building 1 and 2, No. 246 Hualin Road, Huada Residential District, Gulou District, Fuzhou, Fujian Province, China.

## JURISDICTION AND VENUE

7.     This is an action under Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)); Section 43(a)(1)(B) of the Lanham Act (15 U.S.C. § 1125(a)(1)(B)); Section 43(a)(1)(A) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)); Section 43(c) of the Lanham Act (15 U.S.C. § 1125(c)); N.J. Stat. Ann. § 56:4-1 *et seq.*; and New Jersey common law.

8.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.

9.     This Court also has pendant jurisdiction over the New Jersey law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the other claims over which the Court has original jurisdiction that they form part of the same case or controversy.

10.     This Court has personal jurisdiction over Carol Wright because, on information and belief, Carol Wright is an New Jersey corporation, conducts business in this judicial district, and has deliberately engaged in significant and continuous business activities within New Jersey, including sales to residents of this judicial district over the Internet.

11.     This Court has personal jurisdiction over Star Bay because, on information and belief, Star Bay is an New Jersey corporation, conducts business in this judicial district, and has deliberately engaged in significant and continuous business activities within New Jersey, including sales to residents of this judicial district over the Internet.

12.     This Court has personal jurisdiction over Royal Deluxe because, on information and belief, Royal Deluxe is an New Jersey limited liability company, conducts business in this judicial district, and has deliberately engaged in significant and continuous business activities within New Jersey, including transacting business within and from this judicial district.

13.     This Court has personal jurisdiction over 718Closeouts because, on information and belief, 718Closeouts conducts business in this judicial district, and has deliberately engaged in significant and continuous business activities within New Jersey, including transacting business within this judicial district.

14.     This Court has personal jurisdiction over Fujian because, on information and belief, Fujian conducts business in this judicial district, and has deliberately engaged in significant and continuous business activities within New Jersey, including transacting business within this judicial district.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the majority of Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims set forth in this Complaint occurred in New Jersey through at

least Defendants' unauthorized use of the Asserted Trademarks in commerce in New Jersey. The Asserted Trademarks are described below.

## GENERAL ALLEGATIONS

### I.    THE ASSERTED TRADEMARKS

16.    Crocs owns valuable trademarks. These trademarks include Crocs' iconic design marks, which are federally registered as U.S. Trademark Registration No. 5,149,328 ("the '328 Registration") (Exhibit 1) and U.S. Trademark Registration No. 5,273,875 ("the '875 Registration" and together with the '328 Registration, the "Registered Trademarks") (Exhibit 2), and they also include a common law trademark on the vamp of the shoe (the "Vamp Mark" and together with the Registered Trademarks, "the 3D Marks" or the "Crocs 3D Marks"). The Registered Trademarks are on the United States Patent and Trademark Office's ("PTO") Principal-2(F) register.

### A.    The Crocs 3D Marks

17.    The Crocs 3D Marks consist of a three-dimensional configuration of the outside of an upper for a shoe, featuring holes placed across the horizontal portion of the upper. In addition, the Registered Trademarks have a textured strip along the vertical portion of the upper having openings. Furthermore, the design of the '875 Registration also depicts a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap. The 3D Marks were first used in Commerce in June 2003. Images of these marks are reproduced below, with the Vamp Mark found on the horizontal portion of the upper for both figures:[1]

---

[1] These images are reproduced several times in this complaint. For the sake of convenience, the Vamp Mark is not provided as a separate diagram.

**FIGURE 1: Representative Images of Crocs 3D Marks**

| Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|

 

18.     The 3D Marks were not subject to a prior registration or unsuccessful registration.

### 1.     The Crocs 3D Marks Are Famous

19.     As set forth below, the general consuming public of the United States widely recognizes the 3D Marks as a designation of origin of the footwear products that Crocs manufactures, sells, distributes, and promotes. In particular, the 3D Marks are widely publicized both by Crocs and third parties; products bearing the 3D Marks are sold extensively throughout the United States; and the 3D Marks enjoy federal trademark registration.

### a.     Crocs Distributes Shoes Bearing the 3D Marks Through Many Different Channels and Market Segments

20.     Crocs distributes its iconic footwear through a vast network of domestic distribution channels, including major retailers and department stores such as Nordstrom, Journeys, Foot Locker, Finish Line, Urban Outfitters, Shoe Carnival, Designer Shoe Warehouse, and Famous footwear; sporting good and outdoor retailers such as REI, Dick's Sporting Goods, and Academy Sports; and online retail outlets like Zappos.com, Shoes.com, and Amazon.com. Crocs also distributes its footwear through various and sundry specialty channels, including gift shops, collegiate bookstores, uniform suppliers, independent bicycle dealers, specialty food retailers, and health and beauty stores. Crocs footwear is available for sale in countless store

locations domestically, and in over 90 countries worldwide. In addition, Crocs sells its footwear through its website, www.crocs.com, and in Crocs' own retail stores all over the world.

21.     Crocs' iconic Classic Clog was conceptualized during a sailing trip and originally presented to consumers as a boat shoe. Soon after, it became apparent that the shoe appealed to consumers of all demographics seeking fun and friendly, comfortable footwear. By 2005, the Crocs shoe reflected in the Crocs 3D Marks had become recognized as a new standard-bearer in the fashion, professional, and casual lifestyle footwear markets.

22.     Figure 2, below, highlights how the Classic Clog incorporates the 3D Marks:

**FIGURE 2: Representative Images of Crocs 3D Marks with the Classic Clog**

| Registration No. 5,149,328 | Registration No. 5,273,875 | The Classic Clog |
| --- | --- | --- |



23.     For the past two decades, Crocs has produced footwear, including the Classic Clog, that bears the Crocs 3D Marks. These footwear products are marketed for men, women, and children of all ages. Crocs' customers come from all backgrounds, occupations, education and income levels, and geographic regions in the United States.

24.     Through unconventional collaborations with different brands, celebrities, and artists, the Classic Clog continues to reach diverse and specific psychographic market segments as Crocs regularly repackages the shoes into new footwear models bearing the Crocs 3D Marks. The list of these partnerships includes modern pop artists like Justin Bieber and Post Malone, Los Angeles high-fashion apparel brands Pleasures and Chinatown Market, the luxury department store Barneys New York, and fast-food chain KFC.

25.     The Crocs 3D Marks also appear in footwear marketed and sold to specific occupational groups, such as the restaurant, hospitality, and healthcare industries. The rise in stay-at-home workers caused by the COVID-19 pandemic has created additional market reach into occupational segments, as working professionals have sought out comfortable, casual footwear for use during the remote workday at home.

26.     Finally, Crocs has generated substantial revenue from the sales of its footwear products bearing the 3D Marks.  Over the past three calendar years, for example, Crocs has sold millions of pairs of shoes bearing the 3D Marks in the United States alone, corresponding to hundreds of millions of dollars in revenue.

> **b.     The Crocs 3D Marks Receive Substantial Publicity and the Marks Are Widely Recognized by the Consuming Public**

27.     Since its debut, Crocs footwear bearing the Crocs 3D Marks has received substantial publicity. By 2006, the Classic Clog had already morphed into "a global phenomenon" thanks to its distinctive look. And that same year, the company's success was recognized with a marketing award for garnering more than 800 million editorial impressions.

28.     Beyond Crocs' marketing efforts, the design of the iconic Crocs footwear, which is depicted in the 3D Marks, is itself responsible for generating much of the publicity that Crocs receives. Its unusual and distinctive appearance caused an uproar in the fashion footwear world, and it has made the classic Crocs shoe a source of unending debate. The footwear even inspired an anti-Crocs movement on social media with millions of followers, and an "I Hate Crocs" blog, which sold its own anti-Crocs merchandise. Public figures "caught" wearing Crocs shoes in public have helped to keep the media spotlight trained on shoes bearing the Crocs 3D Marks. President George W. Bush made international news when he was seen wearing a pair of Classic Clogs. Former First Lady Michelle Obama also drew international attention when she was spotted in

shoes with heels bearing Crocs trademarks. And in the United Kingdom, Prince George caused Crocs footwear sales to skyrocket after he wore a pair of Crocs bearing the Crocs trademarks.

29.     Other celebrities have also kept attention on Crocs by wearing the shoes in public, including television and movie stars like Jack Nicholson, Whoopi Goldberg, John Cena, Shia LaBeouf, Jennifer Garner, and Sacha Baron Cohen, and famous musicians like Ariana Grande, Post Malone and Justin Bieber.

30.     The Crocs 3D Marks receive substantial publicity on social media, too. For example, a viral video "Crocs Shaving Cream Challenge" has led to hundreds of thousands of online videos consisting of "filling a Crocs shoe with shaving cream and then jamming your foot in." Similarly, a viral six-second video of a grandmother wearing the classic Crocs shoe has received tens of millions of views. Similarly, a countless number of memes featuring the Crocs shoe have spread across different social media platforms, a trend that Crocs itself has embraced. Indeed, the Classic Clog garnered nearly 25 billion observed media impressions in 2020 alone.

### c.     The 3D Marks Are Federally Registered

31.     Two of the Crocs 3D Marks were federally registered on February 28, 2017 as U.S. Trademark Registration No. 5,149,328, and on August 29, 2017 as U.S. Trademark Registration No. 5,273,875. The Vamp Mark is a common law trademark.

### 2.     The Crocs 3D Marks Are Not Functional

32.     The 3D Marks feature one-of-a-kind ornamental design characteristics that give the overall impression of a fun and distinctively quirky clog-like shoe for which Crocs is well-known. The distinctively gentle slope of the upper gives the shoe a unique, recognizable outline.

33.     Given the virtually unlimited number of different, non-infringing footwear styles in existence today, and which are available to other footwear companies, Crocs' competitors do not have any actual competitive need to use the Crocs 3D Marks in commerce.

8

34.     As explained in greater detail below, the Crocs 3D Marks are intentionally and frequently copied, not due to competitive need, but because of the significant goodwill that the Crocs 3D Marks have accumulated over the past two decades during their use by Crocs.

**B.     Crocs Rarely Licenses the 3D Marks**

35.     Crocs has licensed the 3D Marks on only one occasion, and thus has an especially keen interest in protecting them from the kind of confusion and dilution that occurs from the unlicensed use of its marks by knockoffs that are labeled with the name of the knockoff's manufacturer.

36.     Specifically, in 2017 Crocs unveiled a licensing partnership with famed footwear designer Balenciaga. These shoes retailed for $850, and were described as one of the "hottest trends" of 2018 by Business Insider.

37.     The Balenciaga/Crocs cross-over shoe was a smashing success: the shoes sold out during pre-release, even before they were officially available for purchase. They were offered on certain high-end e-commerce sites including Barneys New York.

38.     The cross-over shoes incorporate the 3D Marks. Notably, the shoes feature round holes placed across the horizontal portion of the upper, and a textured strip along the vertical portion of the upper having trapezoidal openings. In addition to these features, the shoes also have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap, as contemplated by the '875 Registration. A representative image of these shoes are shown below:



39.     A close-up of the shoe reveals Balenciaga's name on the button connection the heel strap to the body of the shoe, which replaces the usual Crocs logo found in the same spot:



40.     Other configurations of the shoe included Balenciaga's name as a shoe charm:



## II.    PLAINTIFF CROCS

### A.    History of Crocs

41.    Crocs was founded in 2002 by three college friends and innovators who shared a love for sailing. That year, co-founder Scott Seamans saw a shoe developed and manufactured by Canadian company Foam Creations, Inc. He came up with the idea to add a foam strap to the shoe, and the Classic Clog was born. He and his friends George Boedecker and Lyndon "Duke" Hanson embarked on a Caribbean sailing trip on a quest to perfect the shoe and, by November 2002, Crocs had sold its first thousand pairs. After expanding domestic distribution and production capacity, Crocs acquired Foam Creations in June 2004. Around that time, Crocs also added warehouses and shipping programs for speedy assembly and delivery.

42.     Crocs launched its first national marketing campaign in 2005 after partnering with a local Colorado advertising firm. The campaign played on the distinctively quirky design elements of the clog-like shoe that is embodied in the Crocs 3D Marks, and across the country, it spread the company's message that "Ugly Can Be Beautiful."

43.     Continuing its upward trajectory, Crocs began to lay the foundation for an Initial Public Offering ("IPO"). The company turned a net profit of $16.7 million for 2005, when Footwear News named it "Brand of the Year". Then, in 2006, Crocs launched the largest footwear IPO in history, raising approximately $208 million in its 9.9 million-share offering.

44.     After suffering through the 2008 economic crisis and its aftermath, Crocs began its rebound in 2011, when it opened hundreds of new stores and reported sales of $1 billion worldwide for the first time in its history.

45.     Building on that success, the company implemented a return to the basics that relied on the goodwill it had established around the Crocs 3D Marks over the past decade by reintroducing the Classic Clog with attention-grabbing celebrity partnerships and a fresh ad campaign that overtly acknowledged the company's detractors. The new "Come As You Are" campaign invited footwear shoppers to be themselves, and to recognize the false choice between comfort and style by embracing quirky, clog-like foam shoes.

46.     During the past few years, Crocs has seen continued and steady sales growth as a result of its revitalization. Lyst, the largest global fashion search platform, reported in 2020 that, based on web searches, the Classic Clog that is embodied in the Crocs 3D Marks was the eighth most wanted item in the world. The New York Times declared that "Crocs Won 2020," and fashion bloggers predicted that "2021 will be the Year of the Croc."

47.     The sale of footwear bearing the Crocs 3D Marks is responsible for the establishment of Crocs as an institution in the footwear industry, and the goodwill built into these marks that continue to carry the company to greater heights.

**B.      Crocs Footwear**

48.     Today, Crocs makes footwear in hundreds of forms and color patterns, ranging from khaki canvas loafers to tie-dyed sandals. Among this wide variety of options, the Classic Clog that features the Crocs 3D Marks remains the company's flagship shoe.

49.     Crocs has produced multiple lines of footwear that embody the Crocs 3D Marks, beginning with the classic "Beach" model.  The "Cayman," "Metro," and "Bistro" lines that followed also reflect one or more of the Crocs 3D Marks. As the brand's forebearers, these shoes in particular have inspired countless imitations.  The Crocs 3D Marks are also reflected in numerous other Crocs styles and models, including at least the following current footwear, each of which may include multiple models: Classic Clog (including Bae, Platform and All-Terrain models), Baya Clog, Freesail Clog, and Crocs Littles Clog.

**C.      Crocs Vigorously Defends its Intellectual Property, Including its 3D Marks**

50.     Crocs devotes significant time and resources to stopping infringement of its 3D Marks. Its enforcement actions are diverse and multi-faceted, ranging from full litigation to educational outreach depending on what is warranted by the circumstances.

51.     The scale of this infringement requires constant attention. Each year, enforcement officials around the world, including authorities in the United States, seize hundreds of thousands of shoes that improperly bear the Crocs 3D Marks. For many of these products, the United States is the intended final destination. In more recent years, the rise in consumer online shopping has enabled the sale of infringing footwear on an unprecedented scale. For example, in 2018, Crocs'

defense efforts resulted in the termination of over 70,000 online auctions for infringing products, and the shutdown of over 1,500 websites, in the United States alone.

52.    Crocs works with various third-party agencies to monitor and eradicate the infringing use of the 3D Marks. One such agency Crocs has used is MarkMonitor, which monitors websites around the world for unauthorized or improper use of Crocs' trademark; the use of the Crocs brand in a domain name to redirect traffic to websites containing sponsored links or product listing for footwear sold by other companies; or web articles containing Crocs' trademarks that are used to drive traffic to paid links.

## III.    DEFENDANTS

### A.    Carol Wright

53.    On information and belief, Carol Wright is a New Jersey corporation with its principal place of business at 100 Nixon Lane, Edison, New Jersey. On information and belief, Carol Wright owns and operates the website carolwright.com.

#### 1.    Carol Wright's Background

54.    On information and belief, Carol Wright is primarily an e-commerce business that features many "As Seen on TV" items. According to its website, Carol Wright has been selling clothing apparel and footwear products since 1972 by direct mail marketing, and since 2001 through its online store.

55.    Carol Wright primarily sells its products through its own website, carolwright.com, as well as on e-commerce platforms such as amazon.com.

#### 2.    Carol Wright's Accused Products

56.    Carol Wright's Accused Products include at least its "Casual Slingback Clog" footwear products and colorable imitations. Representative images of Carol Wright's Accused Products are shown below:

14

 

57.     On information and belief, Carol Wright has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

58.     The Accused Products are manufactured abroad and are imported into the United States. As the pictures show, the shoes have a label stating "Made in China."

### 3.     Carol Wright's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

59.     Carol Wright manufactures, imports into the United States, promotes, distributes, and/or sells after importation in the United States Carol Wright's Accused Products.

60.     For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs' 3D Marks.

### a.     Crocs Owned Protectable and Famous Trademark Rights Before Carol Wright Promoted and Sold Accused Products

61.     On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Carol Wright began promoting and selling the Accused Products after the Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

62.     The Registered Trademarks relevant to Carol Wright's violations are also the subject of duly issued United States Trademark Registrations.

15

b.      Carol Wright's Accused Products Are Likely to Cause Confusion with the Crocs' 3D Marks

63.      As shown in Figure 3 below, Carol Wright's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products is confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 3: Representative Images of Carol Wright's Accused Products and the Crocs 3D Marks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
| --- | --- | --- |



"Casual Slingback Clog"

c.      Carol Wright Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

64.      Carol Wright's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Carol Wright's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Carol Wright's intentional copying.

> **d.    Carol Wright Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the 3D Marks**

65.    On information and belief, Carol Wright promotes and sells its Accused Products through direct mail marketing and through the Internet.

66.    On information and belief, Carol Wright's Accused Products have been promoted and sold for approximately $10.

67.    On information and belief, Carol Wright promotes and sells its Accused Products as casual or lifestyle shoes designed primarily for adult men and women.

> **e.    Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Carol Wright's Accused Products**

68.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience confusion regarding the source, affiliation, sponsorship, or association of Carol Wright's Accused Products when confronted with promotions and sales of Carol Wright's Accused Products.

69.    In the post-sale context, where actual or potential consumers of shoes may only see Carol Wright's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Carol Wright's Accused Products with Crocs and/or the 3D Marks, or to associate the Accused Products with Crocs and/or the 3D Marks.

> **f.    Carol Wright's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

70.    Due to the overwhelming similarities between Carol Wright's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion

17

between Carol Wright or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

**B.**    **Star Bay**

71.    On information and belief, Star Bay is a New Jersey corporation with its principal place of business located at 390-400 Railroad Avenue, Hackensack, New Jersey.

**1.**    **Star Bay's Background**

72.    On information and belief, Star Bay was incorporated on or about November 21, 2005. Star Bay describes itself as a "professional footwear importer & exporter specializing in various slippers, including beaded, sequin, Moccasin, EVA, indoor and casual, sports sandals, and so on."

73.    Star Bay sells its products through its website, starbaygroup.com.

**2.**    **Star Bay's Accused Products**

74.    Star Bay's Accused Products include at least its "Men's Garden Shoes" footwear products and colorable imitations. Representative images of Star Bay's accused Products are shown below:









75.     On information and belief, Star Bay has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

76.     The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

3.      **Star Bay's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks**

77.     Star Bay manufactures, imports into the United States, promotes, distributes, and/or sells after importation in the United States Star Bay's Accused Products.

78.     For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs' 3D Marks.

a.      **Crocs Owned Protectable and Famous Trademark Rights Before Star Bay Promoted and Sold Accused Products**

79.     On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Star Bay began promoting and selling the Accused Products after the Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

80.     The Registered Trademarks relevant to Star Bay's violations are also the subject of duly issued United States Trademark Registrations.

b.      **Star Bay's Accused Products are Likely to Cause Confusion with the Crocs' 3D Marks**

81.     As shown in Figure 4 below, Star Bay's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products is confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 4: Representative Images of Star Bay's Accused Products and the Crocs 3D Marks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|





"Men's Garden Shoes"

    **c.**    **Star Bay Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks**

82.    Star Bay's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Star Bay's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Star Bay's intentional copying.

    **d.**    **Star Bay Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the 3D Marks**

83.    On information and belief, Star Bay promotes and sells its Accused Products at its brick-and-mortar warehouse in New Jersey and through the Internet.

84.    On information and belief, Star Bay's Accused Products have been promoted and sold between approximately $2.50 per pair or $120 for a case of 48 pairs.

85.    On information and belief, Star Bay promotes and sells its Accused Products as casual or lifestyle shoes for men.

### e.   Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Star Bay's Accused Products

86.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Star Bay's Accused Products when confronted with promotions and sales of Star Bay's Accused Products.

87.    In the post-sale context, where actual or potential consumers of shoes may only see Star Bay's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Star Bay's Accused Products with Crocs and/or the 3D Marks, or to associate the Accused Products with Crocs and/or the 3D Marks.

### f.   Star Bay's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks

88.    Due to the overwhelming similarities between Star Bay's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Star Bay or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

### C.   718Closeouts

89.    On information and belief, 718Closeouts is an unincorporated business with its principal place of business at 1181 Liberty Avenue, Brooklyn, New York. On information and belief, Royal Deluxe is a New Jersey limited liability company with its principal place of business at 165 Spring Street in New Providence, New Jersey. On information and belief, Fujian is a Chinese corporation with a principal place of business at Rm. 02, Connector of Hongyuan Building 1 and 2, No. 246 Hualin Road, Huada Residential District, Gulou District, Fuzhou, Fujian Province, China.

90. On information and belief, Fujian supplies Royal Deluxe with the Accused Products described below. Royal Deluxe then distributes them to 718Closeouts. 718Closeouts, Royal Deluxe, and Fujian are collectively referred to as "718Closeouts" for the sake of convenience.

### 1. 718Closeouts' Background

91. On information and belief, 718Closeouts sells a variety of goods including apparel, home goods, consumer electronics, and cosmetic products.

92. 718Closeouts primarily sells its products through its store and website, 718Closeouts.com. 718Closeouts also sells through eBay.

### 2. 718Closeouts' Accused Products

93. 718Closeouts' Accused Products include at least its "Slip on Garden Shoe" footwear products and colorable imitations thereof. Representative images of 718Closeouts' Accused Products are shown below:



94. On information and belief, 718Closeouts has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

95.     The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

### 3.     718Closeouts' Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

96.     718Closeouts manufactures, imports into the United States, promotes, distributes, and/or sells after importation in the United States 718Closeouts' Accused Products.

97.     For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs' 3D Marks.

#### a.     Crocs Owned Protectable and Famous Trademark Rights Before 718Closeouts Promoted and Sold Accused Products

98.     On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, 718Closeouts began promoting and selling the Accused Products after the Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

99.     The Registered Trademarks relevant to 718Closeouts' violations are also the subject of duly issued United States Trademark Registrations.

#### b.     718Closeouts' Accused Products Are Likely to Cause Confusion with the Crocs' 3D Marks

100.     As shown in Figure 5 below, 718Closeouts' Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products is confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of

consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 5: Representative Images of 718Closeouts' Accused Products and the Crocs 3D Marks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|



"Slip on Garden Shoe"

### c.     718Closeouts Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

101.    718Closeouts' intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between 718Closeouts' Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to 718Closeouts' intentional copying.

### d.     718Closeouts Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the 3D Marks

102.    On information and belief, 718Closeouts promotes and sells its Accused Products in its store and through the Internet.

103.    On information and belief, 718Closeouts Accused Products have been promoted and sold for approximately $12.

104.    On information and belief, 718Closeouts promotes and sells its Accused Products as casual or lifestyle shoe designed primarily for men, women, and children.

###### e.    Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by 718Closeouts' Accused Products

105.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of 718Closeouts' Accused Products when confronted with promotions and sales of 718Closeouts' Accused Products.

106.    In the post-sale context, where actual or potential consumers of shoes may only see 718Closeouts' Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of 718Closeouts' Accused Products with Crocs and/or the 3D Marks, or to associate the Accused Products with Crocs and/or the 3D Marks.

###### f.    718Closeouts' Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks

107.    Due to the overwhelming similarities between 718Closeouts' Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between 718Closeouts or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

### COUNT I: TRADEMARK INFRINGEMENT UNDER SECTION 32(1) OF THE LANHAM ACT (15 U.S.C. § 1114(1)) (ALL DEFENDANTS)

108.    Crocs reasserts the allegations in the preceding paragraphs and incorporates them by reference.

109.    The USPTO has granted Crocs federal trademark registrations for the Registered Trademarks.

110.    Crocs used these Registered Trademarks in commerce before Defendants began their unauthorized use of the Registered Trademarks.

111.    Defendants' unauthorized sales and attempted sales of their Accused Products containing Plaintiff's Registered Trademarks to unsuspecting consumers is a violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

112.    Defendants' past and continued sales of their Accused Products has created a substantial likelihood of confusion and caused mistake and deception in consumers' minds.

113.    Defendants' unauthorized use of Crocs' Registered Trademarks constitutes use in commerce, without Crocs' consent, of a reproduction, counterfeit, copy, or colorable imitation of Crocs' Registered Trademarks in connection with the advertisement, promotion, sale, and distribution of products and/or services. That use is likely to cause confusion or mistake, or to deceive customers, and therefore infringes Crocs' Registered Trademarks, in violation of 15 U.S.C. § 1114(1).

114.    As a result of Defendants' continued sale of their Accused Products, Crocs has suffered and will continue to suffer irreparable harm to its goodwill and reputation not only with its customers, who confuse the Accused Products with legitimate Crocs products, but also with the general public, who are confused as to the source of the Accused Products after they have been sold.

115.    Crocs has no adequate remedy at law for this immediate and continuing harm. Absent injunctive relief, Crocs has been and will continue to be irreparably harmed by Defendants' actions.

**COUNT II: FALSE DESIGNATION OF ORIGIN/UNFAIR COMPETITION UNDER
SECTION 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a)) (ALL DEFENDANTS)**

116.   Crocs reasserts the allegations in the preceding paragraphs and incorporates them by reference.

117.   Defendants' use of Crocs' 3D Marks constitutes a false designation of origin within the meaning of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), which is likely to cause confusion, mistake, or deception as to the affiliation, connection, source, origin, authorization, sponsorship, and/or approval of Defendants' commercial activities with respect to Crocs' 3D Marks.

118.   Crocs used these 3D Marks in commerce before Defendants began their unauthorized use of the 3D Marks.

119.   The consuming public is likely to attribute to Crocs Defendants' use of Crocs' 3D Marks as a source of origin, authorization, and/or sponsorship for the products Defendants sells and, further, purchase products from Defendants in the erroneous belief that Defendants are authorized by, associated with, sponsored by, or affiliated with Crocs, when there is no such connection between Crocs and Defendants.

120.   Defendants have acted intentionally and willfully, with the express intent to cause confusion and mistake, to deceive the consuming public, to trade upon the Crocs' quality and reputation, and to appropriate Crocs' valuable trademark rights.

121.   Defendants' conduct has deceived, and is likely to continue to deceive, a material segment of the consumers to whom they have directed their marketing activities.

122.   As a result of this misconduct, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public, who are confused as to the source of the Accused Products after they have been sold.

123.    Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' actions.

## COUNT III - TRADEMARK DILUTION UNDER SECTION 43(c) OF THE LANHAM ACT (15 U.S.C. § 1125(c)) (ALL DEFENDANTS)

124.    Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

125.    The Crocs Registered Trademarks are "famous" as defined in 15 U.S.C. § 1125(c). Defendants' use of these marks constitutes a use of these famous trademarks in commerce.

126.    Crocs used these Registered Trademarks in commerce—and those Registered Trademarks became famous—before Defendants began their unauthorized uses of the Registered Trademarks.

127.    The Crocs Registered Trademarks are widely recognized by the general consuming public of the United states and around the world as designations of source of goods and services. Indeed, consumers instantly recognize the connection between Plaintiff and these famous marks.

128.    Defendants' sell and offer for sale their respective Accused Products in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). The Defendants do so intentionally and maliciously. This dilutes the distinctive quality of Crocs' Registered Trademarks, as well as tarnishes the good will consumers associate with Crocs' Registered Trademarks.

129.    As a result of this misconduct, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public, as Defendants' conduct lessens the value of the Registered Trademarks as identifiers of Crocs' goods and services.

130.    Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' actions.

## COUNT IV - STATUTORY UNFAIR COMPETITION (N.J. Stat. Ann. § 56:4-1 *et seq.*) (ALL DEFENDANTS)

131.    Crocs reasserts the allegations in the preceding paragraphs and incorporates them by reference.

132.    Defendants' acts constitute unlawful and unfair business practices in violation of N.J. Stat. Ann. § 56:4-1 *et seq.*

133.    Defendants' infringing activities have damaged and caused irreparable harm to Crocs and, unless restrained, will continue to damage and cause irreparable injury to Crocs' good will and reputation.

134.    Defendants' acts have injured, and will continue to injure, Crocs by, among other things, diluting Crocs' 3D Marks, confusing customers, and injuring Crocs' reputation.

135.    Defendants' use of Crocs' 3D Marks deceives customers and potential customers regarding the origin of Crocs' goods and services.

136.    In addition, Defendants have traded off of Crocs' popularity and goodwill in marketing, selling, and profiting from their Accused Products.  Defendants' Accused Products have caused, and are likely to cause in the future, impairment of the distinctiveness of the 3D Marks due consumers' association with Defendants' similar marks and trade names. Similarly, the reputation of Crocs' 3D Marks has been harmed, and is likely to be harmed in the future, through its association with Defendants' similar marks and trade names, which occurs as a result of the promotion and sale of the Accused Products. This confusion and dilution diminish, or threaten to

diminish, the capacity of the 3D Marks to distinguish Crocs goods, constituting substantial present and likely future harm to Crocs.

137.    Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' actions.

## COUNT V - COMMON LAW UNFAIR COMPETITION (ALL DEFENDANTS)

138.    Crocs reasserts the allegations in the preceding paragraphs and incorporates them by reference.

139.    The USPTO has granted Crocs federal trademark registrations for the 3D Marks set forth.

140.    Crocs used these 3D Marks in commerce before Defendants began their unauthorized use of the 3D Marks.

141.    The Crocs 3D Marks acquired substantial secondary meaning and became famous or otherwise well-recognized in the marketplace before Defendants commenced their unauthorized uses of the Crocs 3D Marks in connection with the Accused Products.

142.    The 3D Marks have become a single source identifier distinctly associated with Plaintiff.

143.    Defendants' use of the 3D Marks in commerce, in particular for casual footwear products, which is how Crocs uses the 3D Marks, has or will likely cause confusion in the minds of consumers familiar with Crocs' 3D Marks. Accordingly, consumers of Crocs' 3D Marks will be deceived or confused, or will otherwise be mistaken, as to the source of the business in question when they encounter Defendants' Accused Products.

144.    In addition, Defendants have traded off of Crocs' popularity and goodwill in marketing, selling, and profiting from their Accused Products.  Defendants' Accused Products have caused, and are likely to cause in the future, impairment of the distinctiveness of the 3D Marks due to association by consumers with Defendants' similar marks and trade names. Similarly, the reputation of Crocs' 3D Marks has been harmed, and is likely to be harmed in the future, through its association with Defendants' similar marks and trade names, which occurs as a result of the promotion and sale of the Accused Products. This confusion and dilution diminish, or threaten to diminish, the capacity of the 3D Marks to distinguish Crocs goods, constituting substantial present and likely future harm to Crocs.

145.    As a result of this misconduct, and other instances of unfair competition in which Defendants have engaged, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public.

146.    Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' actions.

## COUNT VI - COMMON LAW TRADEMARK INFRINGEMENT (ALL DEFENDANTS)

147.    Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

148.    As alleged more fully in Section I, *supra*, owns and has a protectable interest in the 3D Marks.

149.    Crocs used the 3D Marks in commerce before Defendants began their unauthorized use of the 3D Marks.

150. Defendants' unauthorized past and continued sales of their Accused Products, as well as their attempted sales of their Accused Products, have created a substantial likelihood of confusion and caused mistake and deception in consumers' minds.

151. Defendants' unauthorized use of Crocs' 3D Marks, as set forth above, constitutes use in commerce, without Crocs' consent, of a reproduction, counterfeit, copy, or colorable imitation of Crocs' 3D Marks in connection with the advertisement, promotion, sale, and distribution of products and/or services. Such use is likely to cause confusion or mistake, or to deceive customers, and therefore infringes Crocs' 3D Marks.

152. As a result of Defendants' continued sale of their Accused Products, Crocs has suffered and will continue to suffer irreparable harm to its goodwill and reputation with not only its customers, who confuse the Accused Products with legitimate Crocs products, but also with the general public, who are confused as to the source of the Accused Products after they have been sold.

153. Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' actions.

## **JURY DEMAND**

Crocs demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

Plaintiff Crocs requests:

A. That the Court enter judgment that:

    1. Each Defendant has violated Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);

2.   Each Defendant has engaged in false designation of origin in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A);

3.   Each Defendant has engaged in trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); and

4.   Each Defendant has engaged in deceptive trade practices in violation of N.J. Stat. Ann. § 56:4-1 *et seq.* and New Jersey common law.

B.   That the Court issue a permanent injunction restraining and enjoining each Defendant, and all of their agents, servants, officers, employees, successors, and assigns, and all other persons or entities in active concert or participation with Defendants from:

1.   Selling, marketing, advertising, importing, or purchasing the Accused Products or colorable imitations;

2.   Using any of Plaintiff's 3D Marks and/or any other confusingly similar designation, alone or in combination with other words, phrases, symbols, or designs, as trademarks, trade names, domain name components or otherwise, to market, advertise, or identify any Defendants' goods or services;

3.   Otherwise infringing Plaintiff's 3D Marks;

4.   Diluting Plaintiff's Registered Trademarks;

5.   Representing or taking any other action likely to cause confusion, mistake, or deception on the part of consumers as to the source or origin of Defendants' products or services or as to any authorization, sponsorship, approval, or affiliation relationship between Defendants and Plaintiff;

6.   Unfairly competing with Plaintiff in any manner whatsoever or otherwise injuring its business reputation in the manner described in this Complaint; and

7.  Engaging in assignments or transfers, formation of new entities or associations or utilization of any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in sub-paragraphs (1) through (6) above.

C.  That the Court enter an order, pursuant to 15 U.S.C. §§ 1116 and 1118, requiring each Defendant, their agents, servants, officers, employees, successors, and assigns, to destroy all Accused Products or colorable imitations that are in Defendants' possession, custody, or control;

D.  That the Court enter an order, pursuant to 15 U.S.C. § 1116, requiring each Defendant to file with the Court and serve upon Plaintiff within 30 days after the entry of the permanent injunction a report, in writing and under oath, setting forth in detail the manner in which that Defendant has each complied with Paragraphs B and C above;

E.  That the Court enter an order, pursuant to 15 U.S.C. § 1117, awarding all profits each Defendant received from the sales and revenues of any kind resulting from their sales of the Accused Products and colorable imitations, as well as all damages that Plaintiff has suffered as a result of Defendants' sales and marketing of the Accused Products and colorable imitations;

F.  That the Court enter an order, pursuant to N.J. Stat. Ann. § 56:4-2 *et seq.*, enjoining Defendants from their unfair acts;

G.  That the Court enter an order enjoining Defendants from infringing Crocs' 3D Marks in violation of New Jersey law;

H.  That the Court enter an order awarding damages and costs to the fullest extent provided for by New Jersey law;

I.  That the Court enter an order awarding Plaintiff's attorneys' fees and costs;

J.  That the Court enter an order awarding Plaintiff's pre-judgment and post-judgment interest; and

K.  That the Court enter such other relief as it deems proper and just.

Dated: July 12, 2021                      Respectfully submitted,

                                          /s/ *Paul J. Fishman*
                                          Paul J. Fishman
                                          Arnold & Porter Kaye Scholer LLP
                                          One Gateway Center, Suite 1025
                                          Newark, NJ 07102
                                          Telephone: (973) 776-1901
                                          Email: paul.fishman@arnoldporter.com

                                          Mark Samartino (*pro hac vice forthcoming*)
                                          Arnold & Porter Kaye Scholer LLP
                                          70 West Madison Street, Suite 4200
                                          Chicago, IL  60602
                                          (312) 583-2300

                                          Michael A. Berta (*pro hac vice forthcoming*)
                                          Isaac Ramsey (*pro hac vice forthcoming*)
                                          Arnold & Porter Kaye Scholer LLP
                                          Three Embarcadero Center, 10th Floor
                                          San Francisco, CA 94111-4024
                                          Telephone: (415) 471-3100
                                          Facsimile:  (415) 471-3400

                                          Thomas T. Carmack (*pro hac vice forthcoming*)
                                          Arnold & Porter Kaye Scholer LLP
                                          3000 El Camino Real
                                          Five Palo Alto Square, Suite 500
                                          Palo Alto, CA 94306-3807
                                          Telephone: (650) 319-4500
                                          Facsimile:  (650) 319-4700

                                          Jacob Michael Bass (*pro hac vice forthcoming*)
                                          Arnold & Porter Kaye Scholer LLP
                                          250 West 55th Street
                                          New York, NY 10019-9710
                                          Telephone: (212) 836-8000
                                          Facsimile:  (212) 836-8689

*Counsel for Plaintiff Crocs, Inc.*

## CERTIFICATION PURSUANT TO LOCAL RULE 11.2

Pursuant to Local Rule 11.2, the undersigned certifies that the matter in controversy is subject to a pending investigation before the United States International Trade Commission entitled *In the Matter of Certain Casual Footwear and Packaging Thereof*, Inv. No. 337-TA-1270 (the "Investigation").  Crocs, Inc. is the Complainant in the Investigation.  The Investigation includes the following Respondents: Cape Robbin Inc., Bijora, Inc. d/b/a Akira, Dr. Leonard's Healthcare Corp. d/b/a Carol Wright, Crocsky, Fullbeauty Brands Inc. d/b/a Kingsize, Hawkins Footwear, Sports Military & Dixie Store, Hobibear Shoes and Clothing Ltd., Hobby Lobby Stores Inc., Ink Tee, La Modish Boutique, Legend Footwear, Inc. d/b/a Wild Diva, Loeffler Randall Inc., Maxhouse Rise Ltd., PW Shoes, Inc. a/k/a P&W, Shoe-Nami, Inc., Skechers USA, Inc., Star Bay Group Inc., Yoki Fashion International LLC, Quanzhou ZhengDe Network Corp. d/b/a Amoji, 718Closeouts, Royal Deluxe Accessories, LLC, and Fujian Huayuan Well Import and Export Trade Co., Ltd.

Dated: July 12, 2021                              By: */s/ Paul J. Fishman*
                                                              Paul J. Fishman, Esq.